# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| DAVID SADDY,<br><br>                   Plaintiff,<br>v.<br><br>AGNESIAN HEALTH CARE, DR. THOMAS W. GROSSMAN, MARGARET M. ANDERSON, and WAUPUN MEMORIAL HOSPITAL,<br><br>                   Defendants. | Case No. 13-CV-519-JPS<br><br><br><br>**ORDER** |

### 1.    INTRODUCTION

On January 9, 2017, the defendants Agnesian Healthcare ("Agnesian"), Dr. Thomas W. Grossman ("Grossman"), Margaret M. Anderson ("Anderson"), and Waupun Memorial Hospital ("Waupun") (Grossman and Anderson collectively referred to as "Defendants") filed a motion for summary judgment. (Docket #166).[1] On January 25, 2017, the plaintiff David Saddy ("Saddy") submitted a response to the motion. (Docket #181). On February 8, 2017, Defendants offered a reply in support of their motion. (Docket #187). For the reasons explained below, the motion must be denied.

### 2.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides the mechanism for seeking summary judgment. Rule 56 states that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A

---

[1] A former defendant, Dr. Enrique Luy ("Luy"), was dismissed pursuant to the parties' stipulation thereto on January 19, 2017. (Docket #174).

"genuine" dispute of material fact is created when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in a light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that

"we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). Internal inconsistencies in a witness's testimony "create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all." *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1170 (7th Cir. 1996) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986)). The non-movant "need not match the movant witness for witness, nor persuade the court that [their] case is convincing, [they] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

3. **RELEVANT FACTS**

The Court will provide a brief timeline of events addressing each of Defendants' roles therein. In accordance with the standard of review, the facts and inferences therefrom are construed in Saddy's favor. The Court limits its discussion to the facts necessary for disposing of the instant motion.

From January 2011 to January 2013, the bulk of the relevant time period, Saddy was housed at Racine Correctional Institution ("Racine"). Prior to 2012, he had an extensive history of knee problems. Before seeing Grossman, Saddy had at least four knee surgeries. Grossman, an orthopedic surgeon working at Waupun and employed by Agnesian, performed two

knee surgeries on Saddy in July 2009 and December 2011, respectively. In a note stemming from the 2011 surgery, Grossman stated that he expected "residuals" from Saddy's knee arthritis. Throughout this time, Saddy received regular treatment to manage his knee pain.

The interactions relevant to this litigation began on May 2, 2012. On that date, Saddy met with Grossman in his office. X-rays confirmed that Saddy had degenerative changes in both knees. Grossman discussed various treatment options with Saddy, including another surgery, use of a cane or wheelchair, or narcotic pain medication. They agreed on the surgery option.[2] The Wisconsin Department of Corrections ("DOC"), which had ultimate custody of Saddy and control over his medical care, approved the surgery. Grossman performed the surgery on July 30, 2012. The surgery was completed without apparent complications. Afterwards, however, Saddy began making complaints of pain and disfigurement in his knees.[3]

On September 4, 2012, Saddy went back to Grossman's office for a follow-up visit. Saddy was not seen by Grossman, but instead met with Anderson, a nurse practitioner who assisted Grossman's practice. X-rays showed that the surgery appeared successful. Anderson collaborated with Grossman to review the X-ray results and discuss Saddy's pain medication, but Grossman did not actually go in to see Saddy. In meeting with Anderson, Saddy indicated that he was concerned about taking too much medication

---

[2]The parties dispute how voluntary Saddy's agreement was, but it is immaterial to the disposition of this motion.

[3]The parties dispute whether Saddy actually complained of disfigurement. Saddy says that he mentioned it to the Racine medical staff and that some of the nurses noticed that his knee was misaligned. Defendants counter that Luy, Racine's DOC physician, remembers no comments from Saddy about disfigurement, and that the first note about the issue in Saddy's medical record came on October 9, 2012.

because he was an addict, but that he could take Tylenol. Anderson discussed the issue with Grossman, who prescribed Saddy the maximum allowable dose of Tylenol.

Saddy also complained about his pain and disfigurement to Anderson. He told her that he was in pain and felt "lousy." (Docket #176 at 170:24-171:14). Saddy further reported that he knees ached. Anderson examined them and found that Saddy did not have discomfort with knee palpitation. He also mentioned that he was having trouble sleeping due to his knee pain. Anderson did not include all of those complaints in her clinical note memorializing the appointment, however. Anderson's note acknowledged Saddy's ache and sleeping issues, but rather than relating Saddy's pain and "lousy" feeling, Anderson indicated that he "reports doing well." (Docket #170-11 at 2). Anderson's note concluded by recommending a follow-up visit in a year. *Id.* Though she acknowledged that Saddy's knees were swollen, Anderson avers that this was normal and denies discussing knee disfigurement with Saddy at the appointment.

Saddy's final relevant appointment was with Grossman on October 31, 2012. Saddy states that he complained of knee pain. Grossman did not include this information in the office note for the visit, though Grossman contends that Saddy had no visible displays of pain at the time. As to knee disfigurement, X-rays were again taken. These, along with Grossman's in-person assessment, led him to conclude that Saddy's gait was "off." Medically speaking, there was "a slight 5 degree difference in valgus alignment between Mr. Saddy's right knee and his left knee." (Docket #170 at ¶ 26). Defendants assert that this "is not unexpected" and "can and does occur in the absence of negligence," but at his deposition, Grossman conceded that "[t]here's a wide range of variation in normal knee alignment,

and I was unable to come up with literature consensus as to what was normal." *Id.* at ¶ 27; (Docket #179 at 84:14-18). It is not clear whether the misalignment was present prior to the July 30 surgery.

Grossman and Saddy discussed Saddy's ongoing pain treatment and agreed on the use of an orthotic shoe apparatus. Saddy refused to see Grossman or Anderson again after October 31, 2012. On December 14, 2012, Saddy met with the orthotic provider. The representative noted "a considerable amount [of] external rotation of the tibia associated with the femur," and that Saddy's "toe angle is probably about a 20 degree angle." Saddy avers that since the July 30, 2012 surgery his pain has been greater than ever before. Defendants counter that pain is normal after this type of surgery, and that Saddy has presented no expert testimony to show that the origin of the new, more severe pain was Grossman's latest surgery. They stress that Saddy has had chronic, degenerative knee conditions for years.

4. ANALYSIS

Upon screening Saddy's complaint, Magistrate Judge Aaron E. Goodstein allowed him to proceed on four claims: 1) deliberate indifference to his serious medical needs, namely for delaying his medical care resulting in untreated pain following the surgery, in violation of the Eighth Amendment, against Grossman and Anderson, 2) failure to appropriately train Grossman and Anderson, a *Monell* theory, against Agnesian and Waupun, 3) medical malpractice against Grossman, and 4) fraud against Grossman and Anderson. (Docket #8 at 7). On December 28, 2016, the parties stipulated to dismissal of all but the first claim. (Docket #165). Thus, Agnesian and Waupun no longer have any claims pending against them and must be dismissed regardless of the Court's disposition of the instant motion.

Defendants seek summary judgment on Saddy's sole remaining claim for their alleged deliberate indifference to his untreated post-surgical pain. (Docket #172). To state a claim for a violation of constitutional rights pursuant to 42 U.S.C. § 1983, a plaintiff must prove that: 1) he was deprived of a right secured by the Constitution or laws of the United States; and 2) the deprivation was visited upon him by a person or persons acting under color of state law. *Buchanan-Moore v. Cnty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009); *see also Gomez v. Toledo*, 446 U.S. 635, 640 (1980). For purposes of this motion, Defendants do not dispute that they acted under the color of state law.[4] They do, however, argue that they did not violate Saddy's Eighth Amendment right to be free from "deliberately indifferent" medical care.

The *Gayton* court outlined the law of a "deliberate indifference" claim:

> [T]he plaintiff must show that: (1) [he] had an objectively serious medical condition; (2) the defendants knew of the condition and were deliberately indifferent to treating [him]; and (3) this indifference caused [him] some injury. An objectively serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention. A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated.
> With regard to the deliberate indifference prong, the plaintiff must show that the official acted with the requisite culpable state of mind. This inquiry has two components. The official must have subjective knowledge of the risk to the inmate's health, and the official also must disregard that risk.

---

[4]Agnesian, Grossman and Anderson's employer, provided healthcare services to DOC inmates pursuant to contract. (Docket #172 at 10 n.2). Defendants concede that this subjects them to Section 1983 liability even though they are not governmental employees. *See de Vryer v. Maryville Academy*, 544 F. App'x 653, 654 (7th Cir. 2013).

> Evidence that the official acted negligently is insufficient to prove deliberate indifference. Rather, "deliberate indifference" is simply a synonym for intentional or reckless conduct, and that "reckless" describes conduct so dangerous that the deliberate nature of the defendant's actions can be inferred. Simply put, an official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Even if a defendant recognizes the substantial risk, he is free from liability if he responded reasonably to the risk, even if the harm ultimately was not averted.

*Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (citations and quotations omitted). As Defendants do not contest the first element, the Court turns its attention to the second.[5]

The heart of this case is whether Defendants exhibited deliberate indifference to Saddy's medical needs. It is important to discern the precise contours of Saddy's claims. They went from all of those identified at the screening stage to the two narrow issues identified in his response brief. Those are first that "Nurse Anderson knew of Mr. Saddy's pain and disfigurement and deliberately misrepresented both in her [clinical] note" from the September 4, 2012 visit. (Docket #181 at 15). Her note, then, "lead[] to at least a two month delay before the pain and disfigurement was finally recognized by Dr. Grossman and remedial measures were offered." *Id.* at 11.

---

[5]Defendants do not argue that Saddy's complained-of condition, pain resulting from Defendants' allegedly substandard care following his double knee replacement, is not sufficiently serious. *See* (Docket #172 at 10-21 and #187). Saddy, nevertheless, argues the point. (Docket #181 at 12-14). Without opposition from Defendants, the Court must conclude that a triable issue of fact exists as to whether Saddy's condition was serious. *Gutierrez v. Peters*, 111 F.3d 1364, (7th Cir. 1997) (finding that while not "every ache and pain or medically recognized condition involving some discomfort can support an Eighth Amendment claim," this Circuit and others "have repeatedly recognized that delays in treating painful medical conditions that are not life-threatening can support Eighth Amendment claims").

Second, as to Grossman, he knew he should have seen Saddy himself at the September 4 appointment, but by delegating the responsibility to Anderson, he contributed to delaying the pain diagnosis he would make two months later. *Id.* at 16-17. His mere "colloboration" with Anderson at that time was, in Saddy's view, insufficient to discharge his professional clinical obligations. *Id.*

As noted by Judge Goodstein, a deliberate indifference claim may be advanced for delaying medical treatment to an inmate. (Docket #8 at 6); *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). This is "especially where the result is prolonged and unnecessary pain." *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010). Further, "a non-trivial delay in treating serious pain can be actionable even without expert medical testimony showing that the delay aggravated the underlying condition." *Id.* When viewing the facts most favorably to Saddy, a reasonable jury could infer that he suffered a painful two-month delay in receiving appropriate treatment due to Defendants' actions or inactions. Defendants do not argue that Saddy's pain was imaginary or that the two-month delay was less than what is constitutionally actionable. *See McGowan*, 612 F.3d at 640 ("[T]he length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment."). Instead, they attack various other potential factual and legal infirmities with Saddy's claims. The Court address each in turn.

As a preliminary matter, the Court must ignore Defendants' references to the report of their expert witness, Dr. Steven J. Merkow ("Merkow"), dated February 3, 2016. *See* (Docket #180-1). Defendants may not marshal arguments and evidence for the first time in their reply when they were available and relevant to the issues in their opening brief. *Kenall Mfg. Co. v. H.E. Williams, Inc.*, No. 09-C-1284, 2012 WL 4434370 at *3 (N.D. Ill. Sept. 24,

2012) ("[A]rguments and evidence that could have been raised in the opening brief but are first raised in a reply brief are generally deemed waived.") (citing *Judge v. Quinn*, 612 F.3d 537, 542 (7th Cir. 2010)). Merkow and his opinions were not part of the original brief or statement of facts. *See* (Docket #171 and #172). Defendants' first reference to Merkow is in their reply, and the reply cites his opinions extensively to show that their actions comported with accepted standards of medical practice. (Docket #187 at 8-19). As they readily admit, Defendants knew as of December 15, 2016 that Saddy had no expert opinions to offer in this case. *Id.* at 8. Thus, their own briefs show that Merkow's opinions were available and relevant to their arguments by January 9, 2017, the date their first brief was filed.

Defendants stress that if Saddy cannot show medical negligence via expert opinion, his deliberate indifference claim must fail. *Id.* at 9-11. While this is true in certain instances, the Seventh Circuit's reading of the constitutional cause of action is broader than that, making it provable by many other means beyond pure expert opinion. *See Petties v. Carter*, 836 F.3d 722, 728-731 (7th Cir. 2016). Saddy's claim falls within the latter categories. Namely, defendants do not, and cannot, argue that it would be appropriate for a minimally competent professional to lie in a clinical note about a patient's symptoms, or to refuse to see the patient, knowing that those actions risked permitting severe, continuing pain. *See Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) ("A prisoner, however, need not prove that the [medical personnel] intended, hoped for, or desired the harm that transpired. Nor does a prisoner need to show that he was literally ignored. That the prisoner received some treatment does not foreclose his deliberate indifference claim if the treatment received was so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate his

condition." (citations and quotations omitted)). Still, to the extent Saddy continues to complain about Defendants' treatment outside of the issues identified above, those complaints are defeated by his inability to secure favorable expert testimony. *Id.* at 759 ("Without some evidence, such as expert opinion testimony, creating a reasonable inference that Dr. Webster's treatment during this time frame was so inadequate that it demonstrated an absence of professional judgment, Arnett cannot succeed against him on summary judgment.").[6]

Beyond Merkow's opinions, Anderson raises two additional arguments. First, she contends that because Saddy voluntarily dismissed his fraud claim against her, he cannot now pursue the same theory under the aegis of deliberate indifference. Anderson believes that any misrepresentation in her note was mere negligence, far short of the recklessness required to establish deliberate indifference. The Court cannot agree. Saddy voluntarily dismissed his fraud claim; it was not struck down by this Court on its merits. Without any authority suggesting that dismissal of the fraud claim eliminates a related deliberate indifference theory—Defendants cite none—the Court will not hold that Saddy's constitutional claim is foreclosed. Further, Anderson's alleged conduct fits within the literal definition of deliberate indifference: Saddy told her he was in pain and his knee was misaligned, but in her indifference to his plight, she deliberately misrepresented those facts in her note and recommended a follow-up visit far in the future.

---

[6]These include, for instance, Saddy's contentions that Grossman pushed him into accepting surgery and whether Saddy's "slight 5 degree difference in valgus alignment" was within acceptable limits for his surgery (or, indeed, whether that was even caused by the surgery).

Second, Anderson asserts that her note could not have delayed Saddy's pain treatment because, in his own words, his pain and disfigurement were obvious. Once Saddy returned to the institution, the Racine medical staff were in a position to address his repeated complaints, and their failure to do so satisfactorily cannot be laid at Anderson's feet. The facts presented do not go this far, however. Defendants offered no statement of fact on the point for Saddy to dispute (or not). They have also presented no evidence at this juncture which would confirm that Anderson's note had no effect on the DOC medical personnel. *See* (Docket #183 at ¶¶ 23-24).[7] Without an undisputed fact or other evidence, the Court must leave the causation question to the jury. *Gayton*, 593 F.3d at 624 ("Proximate cause is a question to be decided by a jury, and only in the rare instance that a plaintiff can proffer no evidence that a delay in medical treatment exacerbated an injury should summary judgment be granted on the issue of causation.").[8]

Grossman also advances two arguments in favor of summary judgment. First, he states that it was "happenstance" that Saddy met with Anderson on September 4, 2012. (Docket #187 at 14). To the extent he could

---

[7]Defendants present voluminous statements of fact and evidence attempting to show that they lacked the ability or authority to affect the treatment Saddy received from DOC medical personnel. (Docket #183 at ¶¶ 32-40, 65-93). None bear on the issue at hand, namely whether the DOC personnel read Anderson's note and relied on that in determining that Saddy needed no further pain treatment.

[8]At this stage, Saddy does not bear the burden to prove his claims; it is instead Defendants' burden to show that they *cannot* be proven on the indisputable facts. *Boss*, 816 F.3d at 916. Defendants' failure to offer appropriate statements of facts or related evidence does not mean that none exists, however. The Court leaves it to the parties to evaluate that evidence, if any, and discuss how that bears on the impending trial of this matter.

be blamed for not handling the appointment, Grossman argues that a nurse practitioner like Anderson is perfectly competent to handle a post-surgery follow-up appointment. *See* Wis. Admin. Code § N 8.10. He further contends, as Saddy generally concedes, that inmates are not entitled to their choice of medical providers. *See* (Docket #181 at 17 n.2).

As with Anderson, however, the Court is left wanting for undisputed facts. Defendants repeatedly refer to Anderson's interaction with Grossman during the September 4 appointment as a "collaboration." (Docket #183 at ¶¶ 22, 51, 56; Docket #172 at 3). What this collaboration entailed is not entirely clear: was Grossman also present in the office? Was he consulted via telephone? The Court remains uninformed. Defendants state that it at least covered "Mr. Saddy's x-ray results, and . . . his refusal to accept certain pain medications for expected post-surgery pain." (Docket #183 at ¶ 56). Under Saddy's view of the facts, one can reasonably infer that Anderson told Grossman about the full extent of Saddy's pain and disfigurement complaints, and that Grossman explicitly or implicitly agreed to withhold them from the office note.

Another reasonable inference would be that, hearing of Saddy's concerns, Grossman should have gone to see him directly. That would have eliminated Saddy's instant claims because, as shown by his clinical evaluation and treatment plan from the October 31 appointment, Grossman would have recognized the misalignment in Saddy's knees and addressed it at that time. Finally, it is not clear how it came about that Anderson handled the appointment. In light of his post-operative statement that he should have seen Saddy, Grossman's decision to delegate the task would lend weight to the conclusion that he was personally responsible for the delay to the same extent as Anderson.

Second, Grossman argues that he was not responsible for setting the October 31, 2012 appointment. That was instead the responsibility of the DOC medical staff, and their failure to set the appointment sooner is no fault of Grossman's. As discussed above, Defendants cannot shift blame to the DOC without offering undisputed evidence that Anderson's clinical note had no effect on their decision-making.

In sum, viewing the facts in a light most favorable to Saddy, they support a jury finding that Anderson misrepresented Saddy's complaints in her clinical note. They further support a finding that Grossman knew he should have seen Saddy on September 4 but did not and that his limited "consultation" with Anderson that day was inadequate to address Saddy's pain. These findings can support an inference that Grossman and Anderson engaged in this conduct with at least a reckless disregard of the risk of continuing pain for Saddy. Saddy has raised more than a mere scintilla of evidence on these issues and it is the jury's province to determine whether, in absence of the favorable standard of review applied here, he has proven them. *See Petties*, 836 F.3d at 731 ("[W]here evidence exists that the defendants knew better than to make the medical decisions that they did, a jury should decide whether or not the defendants were actually ignorant to risk of the harm that they caused."); *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013); *Gayton*, 593 F.3d at 620 ("Whether a medical condition is 'serious' and whether a defendant was 'deliberately indifferent' to it are fact questions, to be resolved by a jury if a plaintiff provides enough evidence to survive summary judgment."). The Court offers no comment on the strength of Saddy's case or his prospects of a successful result at trial, but it finds that there are disputed issues of material fact precluding judgment in Defendants' favor at this juncture.

## 5. CONCLUSION

In light of the foregoing, the Court must dismiss Agnesian and Waupun and deny summary judgment to Grossman and Anderson. This matter remains set for a pretrial conference on March 14, 2017, and a jury trial beginning on March 20, 2017.

Accordingly,

**IT IS ORDERED** that the defendants Agnesian Health Care and Waupun Memorial Hospital be and the same are hereby **DISMISSED** from this action; and

**IT IS FURTHER ORDERED** that the defendants' motion for summary judgment (Docket #166) be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 13th day of February, 2017.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge